UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
───────────────────────────────────────x

JOHN MAGILTON,

        Plaintiff,

    -against-                       04 Civ. 2264 (CM)

ROBERT TOCCO, individually, RICHARD P.
GOLDSMITH, individually, OTTO DICKMAN,
individually, FREDERICK BERG, individually,
JONG-O-LEE, individually, RALPH BUTLER,
individually, and THE COUNTY OF
WESTCHESTER,

        Defendants.

───────────────────────────────────────x

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

McMahon, J.:

        In this First Amendment retaliation action, John Magilton, a Grade 6 Junior Mechanic

employed by the Westchester County Department of Public Works (DPW), seeks damages for a

variety of allegedly adverse employment actions that followed his reports of health and safety

violations to his Union. Defendants have moved for summary judgment. For the reasons stated

below, the motion is granted in part and denied in part.

**Statement of Facts**

        Except as indicated, the following facts are undisputed:

        Plaintiff was a Grade 6 junior mechanic with DPW. From in or about 2002, he was

assigned to work at the HVAC-A Shop at DPW's Grassland facility. Grade 6 is the lowest grade

of mechanic; a Grade 6 mechanic works with a Grade 8 lead mechanic. Plaintiff is a member of

the CSEA.

Defendant Robert Tocco has been the Shop Supervisor in HVAC-A Shop for approximately 14 years. Tocco is a member of the CSEA. He served as Shop Steward for the Union from 1990 until June 2003, when he was removed. Tocco reports to defendant Jong-O-Lee.

Defendant Otto Dickman is a Grade 10 Mechanic who has been the Shop Supervisor of the HVAC-B Shop at Grasslands since about 1989. He is a member of CSEA and a former Shop Steward (albeit many years ago). Dickman also reports to Lee. Plaintiff worked in Dickman's shop for several months during the year 2000.

Defendant Jong-O-Lee has been the Deputy Superintendent of Buildings at Grasslands since the late 1980s. Among the shops he manages are HVAC-A and HVAC-B. He also manages the Central Heating Plant (CHP). Lee is a member of the CSEA. He reports to the Superintendent of Buildings and Grounds. Prior to December 2002 that person was Gary Proft. Since that time, Lee has reported to defendant Richard Goldsmith.

Defendant Richard Goldsmith has worked for the County since 1979. He became the Superintendent of Maintenance at Grasslands in December 2002. Prior to that time Goldsmith was a Deputy Superintendent. He had no direct responsibility over either of the HVAC shops at Grasslands. Goldsmith is a member of CSEA. He reports to Gary Proft, who is now the Director of Operations.

Defendant Ralph Butler is the Commissioner of the DPW and has been since August 2002.

As Commissioner, Butler has exclusive authority under the Westchester County Charter

to prefer disciplinary charged under Section 75 of the Civil Service Law against DPW employees. He made the final decision to prefer Section 75 charges against plaintiff.

Shop Supervisors had no authority either to "write up" a subordinate formally or to issue a disciplinary counseling form to a subordinate.

The HVAC-A Shop is responsible for repairing HVAC equipment at various County facilities, including the County Jail and the Public Health Labs.

The HVAC-B Shop is responsible for preventive maintenance on HVAC equipment at Grasslands.

Plaintiff's father, Edward Magilton, was elected a Vice President of the CSEA in or about July 2001. Shortly thereafter, plaintiff was named a Shop Steward for the CSEA. Plaintiff was named to the Union's Health and Safety Committee following his election as Shop Steward.

The Health and Safety Committee was chaired by Peter Costa. Its members were CSEA members representing various County Departments. None of the defendants were on the Health and Safety Committee or attended any meetings of that committee. All defendants deny knowing what plaintiff may have said at Committee meetings, and plaintiff offers no evidence to the contrary.

*Alleged Protected Conduct: The Confined Space Complaint*

Sometime prior to February 2002, plaintiff complained to the Health and Safety Committee alleging that the DPW did not have proper safety policies (including "confined space" policies) at the Grasslands Reservation. In February 2002, Jack McPhillips, President of CSEA, filed a complaint against the County with the New York State Public Employees Safety and Health Department (PESH).

3

PESH conducted an investigation into the complaint. As part of that investigation, it conducted an inspection at Grasslands on April 25, 2002.

On July 18, 2002, the County was cited for violations of PESH provisions relating to confined spaces, respiratory protection and personal protection equipment. As a result, the County hired a consultant to develop confined space and respirator policies for DPW.

Defendants allege that plaintiff's identity as the initiator of the complaint was never revealed during the investigation. Plaintiff alleges that defendant Tocco was present at the opening conference of the PESH inspection, at which a copy of the February 2002 complaint was handed out. At that meeting, plaintiff was allegedly identified as the initiator.[1]

Plaintiff also alleges that various other information that was indisputably available to the defendants identified him as, if not the initiator, at least as being involved with the complaint. These include the following alleged sources of information:

> • On August 22, 2002, plaintiff was quoted in a newspaper article about the citation as follows: "'There are no safety policies in place. They've been sending men into these confined spaces for years,' said John Magilton, a shop steward for the county chapter of the Civil Service Employees Association, which filed the complaint that led to the citations. 'We're trying to get safety standards and training for the men, but it's been slow in coming.'" The article was posted on the bulletin board at DPW's entrance.

> • Plaintiff photographed defendant Lee in a manhole. This photograph was allegedly the source of considerable talk at DPW. At least Dickman recalled being aware of plaintiff's participation.

> • In May 2003, CSEA circulated to all its members (which

---

[1] Obviously, this paragraph sets forth allegations of the parties, not undisputed facts. Defendants' protestations to the contrary, there is clearly a dispute over whether defendants – any or all of them – knew that plaintiff initiated the complaint.

includes all defendants except Butler) a special newsletter focused on health and safety issues and on the Committee's actions. Plaintiff was identified on the front page as a member of the Grasslands Health and Safety Committee.

Plaintiff also allegedly expressed concern about several other health and safety related matters directly to Goldsmith, Lee, Butler, Proft, Tocco, and Dickman. These contacts (which did not involve the submission of any formal complaint to PESH) involved the need for safety goggles for himself and his partner (Tocco), the need for employees working on exhaust fans at the Public Health Labs to wear masks (Dickman), the need for eyewash stations (Tocco), and the need for freon alarms (Goldsmith, Butler, Lee, Proft). The dates of these complaints are not specified.

*Alleged Retaliation: Overtime Pay*

Plaintiff was not assigned to work overtime doing preventive maintenance at the Public Health Labs in 2003. Two other A Shop mechanics were given such overtime, although other A Shop mechanics were not.

Dickman was in charge of assigning overtime at the Public Health Labs in 2003.

In or about April 23, 2003, Dickman and plaintiff argued about the fact that plaintiff was not getting overtime work at the Public Health Labs and about whether Dickman was violating DPW policy by not assigning plaintiff overtime.

In 2002, plaintiff was assigned to work at the Public Health Labs. He was offered overtime work at the PHL in 2002, when he was working there on a regular basis.

In 2003 plaintiff was assigned to work at the County Jail.

In 2003, the two A Shop mechanics who were given overtime at the Public Health Labs were assigned to the Public Health Labs.

Plaintiff's name has at all times been on the All-Shop Personnel List for DPW Grasslands Operations. He cannot recall ever having been called in on emergency overtime.

Plaintiff has no evidence to refute defendants' assertion that no Grade 6 Mechanic has ever been included on the HVAC-A Shop Emergency Call-In list, because Grade 6 Mechanics cannot work on most repairs alone. However, Emergency Call-In lists for other shops do include Grade 6 mechanics.

Plaintiff testified at his deposition that the only overtime he believed he had been wrongfully denied was the overtime at the Public Health Labs. He now contends that he was denied additional overtime opportunities, based on what he claims were belatedly produced documents.

*Alleged Protected Conduct: Whistleblower Complaint*

On July 11, 2003, plaintiff himself filed a "Whistleblower Complaint" with PESH, alleging that Plaintiff was being discriminated against because of his activities in reporting health and safety violations.

On August 6, 2003, PESH investigator Jay Elzweig met with personnel at DPW concerning plaintiff's PESH complaint of retaliation.[2]

*Alleged Retaliation: Section 75 Discipline*

On August 12, 2003, McPhillips sent a memo to Waltman, copied to Butler and Goldsmith, in which he wrote, "John [Magilton] has been tormented by his supervisors since his

---

[2] Elsweig testified that he met with Butler and others. Butler denies knowing anything about the Whistleblower Complaint prior to initiating the Section 75 proceeding against plaintiff. Obviously, what we have here is another disputed issue of material fact.

involvement in bringing out the PESH violations at Grasslands."

On August 12, 2003, plaintiff was at a counseling meeting attended by his Union representative, Goldsmith, and Tocco, when he was handed two written counseling forms as a result of the April 23, 2003 argument. Plaintiff responded by telling Goldsmith that he could, "Shove the write-ups up his ass." He thereafter left the meeting.

Following the meeting, Goldsmith reported this incident to Meredith Waltman, who in turn advised Butler about the incident.

On August 18, 2003, the County submitted an answer to the Whistleblower Complaint.

On August 18, 2003, Butler advised Deputy County Executive Larry Schwartz that he intended to write up Plaintiff on two charges: insubordination and leaving work without approval.

On or about September 11, 2003, Butler filed Section 75 charges against plaintiff. An amended Notice of Charges was filed on December 31, 2003. The amended Notice included 26 separate specifications, relating to alleged failures to report to his supervisor and the beginning and end of the work day, failure to pick up work assignments, engaging in inappropriate behavior and making inappropriate comments to a supervisor (Goldsmith).

In a report dated January 12, 2005, issued after a lengthy hearing, all of the allegations were sustained by the Hearing Examiner. He recommended that plaintiff be suspended without pay for a period of 60 days.

*Alleged Retaliation: Transfer*

In approximately June 2003, plaintiff asked to be transferred to the Central Heating Plant shop. He did not get the transfer at that time.

Defendant Lee had no power to effect a transfer.

Sometime between April 1 and July 1, 2004, plaintiff was transferred to the Central Heating Plant. The decision to transfer plaintiff was made by Butler and Deputy Commissioner John Hsu. At the time the decision was made, plaintiff had filed this lawsuit.

*Alleged Retaliation: Salary Increment*

Despite the publicity engendered by plaintiff in 2002 as a result of the confined space complaint and the ensuing citation of DPW for health and safety violations, defendant received a normal salary increment in both April 2002 and April 2003.

In April 2004, plaintiff did not receive a salary increment. Butler made the final decision to deny plaintiff a salary increment. He did so after receiving from Lee an Increment Evaluation, in which Lee recommended that plaintiff be denied his increment based on time and attendance issues and lack of cooperation in 2003.

In July 2004, plaintiff received his salary increment. By that time, plaintiff had filed this lawsuit and been transferred to the Central Heating Plant, where his new supervisor gave him an excellent evaluation.

*Alleged Retaliation: Harassment*

Plaintiff contends that he suffered harassment in multiple forms as follows: he was verbally abused and threatened by Dickman, Tocco, and Lee on unspecified dates; he was called into meetings where he was attacked with false allegations and accused of being a troublemaker on four occasions between April 23 and July 11, 2003; he was ignored by Tocco on a daily basis throughout 2003 (an accusation that is inconsistent with his having been verbally abused by Tocco during the same time period); his complaints of retaliation and harassment were ignored

by higher management; he was required to put in for leave time when other employees were not; and he was denied a transfer out of the hostile environment. Plaintiff contends that all of this took place within a five month period, see Pl. Br. at 7 – and that these incidents, coupled with the other instances of retaliation, collectively created a hostile environment.

**Standards for Summary Judgment**

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. FED. R. CIV. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Whether any disputed issue of fact exists is for the Court to determine. Balderman v. United States Veterans Admin., 870 F.2d 57, 60 (2d Cir. 1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. Celotex v. Catrett, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." Anderson, supra, 477 U.S. at 248. Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."

Matsushita Elec. Industries Co., supra, 475 U.S. at 586. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

This is one of those cases in which a plaintiff throws everything at the wall in the hope that enough will stick to get him to trial. And in this particular case, he does get to trial, on a defined subset of his claims against particular defendants who are shown to have had personal involvement in the decisions taken. There are numerous disputed issues of fact (some of which were identified above) that can only be resolved by a jury. So part of defendants' motion must be denied.

However, certain aspects of the motion can be granted because, as to those issues, plaintiff is not entitled to judgment as a matter of law. And defendants' motion for qualified immunity can be and is denied.

**The Claim Against Butler for Retaliation Is Dismissed Insofar as it is Predicated on his Decision to Prefer Charges Under Section 75 of the Civil Service Law**

Under the law in this Circuit, a municipal official is entitled to absolute immunity for his decision to initiate administrative disciplinary proceedings against an employee. Spear v. Town of West Hartford, 954 F.2d 63, 66 (2d Cir. 1992). As this Court noted in a similar case, "absolute immunity" means immunity *without qualification*. Where it attaches, no action for damages lies – even if the official acted for a base motive that would otherwise subject him to suit. Contes v. Porr, 345 F. Supp. 2d 372 (S.D.N.Y. 2004). For this reason, the claim of retaliation against defendant Butler is dismissed with prejudice insofar as it is predicated on the preferment of

disciplinary charges.[3]

### The Claim That Butler Retaliated Against Plaintiff By Denying Him a Salary Increase is Not Dismissed

Plaintiff also contends that Butler's decision to deny plaintiff a salary increment for the period April - June 2004 was retaliatory. There is little question that denial of a raise qualifies as an adverse employment action. <u>Bennett v. Watson Wyatt & Co.</u>, 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001). This is true even where, as here, the damages are *de minimis* because the plaintiff got his raise three months later.[4] So I must permit this claim to go to trial unless no reasonable trier of fact could find a connection between the denial of the raise and any of plaintiff's protected speech.

It is undisputed that plaintiff got salary increments in April 2002 and April 2003, after he initiated the "confined space" complaint. Therefore, insofar as Plaintiff alleges that Butler denied him a raise for initiating that complaint – or for speaking to the press in the spring and summer of 2002 – the claim must be dismissed.

However, Plaintiff filed the Whistleblower Complaint in July 2003. There is at the very least a genuine issue of fact concerning whether Butler was aware of the filing of that complaint – he denies it, but, as noted above, a PESH examiner has testified that he met with Butler to discuss the complaint. The next opportunity Butler had to raise Magilton's salary came in April 2004. While ordinarily the passage of nine months between the protected activity and

---

[3] The other defendant on the Section 75 claim is Goldsmith. As a matter of law, Goldsmith could not file charges under Section 75 and it is the filing that constitutes the adverse employment action. So the claim against Goldsmith is dismissed.

[4] The raise was worth $440 per year to plaintiff, so damages for the one quarter are $110.

the alleged retaliation is far too much to permit an inference of retaliation, <u>Greaves v. St.</u> <u>Luke's/Roosevelt Hosp. Center</u>, No. 03 Civ. 7424(SAS), 2005 WL 627635, at *7 (S.D.N.Y. Mar. 17, 2005), this was the first opportunity that Butler had to "punish" plaintiff in his pocketbook for filing the whistleblower PESH complaint. Given the considerable evidence that would support a finding of retaliatory animus on the part of both Butler and Lee (who recommended that plaintiff not be given a 2004 raise), I decline to dismiss this claim at this time. The jury will be instructed on the law in this Circuit about the passage of time between an incident of protected speech and an incident of alleged retaliation. It will also be instructed that Butler's authorizing raises in 2002 and 2003, as well as his authorizing a raise when plaintiff's new supervisor so requested in July 2004, is evidence that the jury can consider as it decides whether Butler had discriminatory intent earlier in the year.

**The Section 75 Claim, But Not the Salary Increment Claim, Against Westchester County Is Dismissed**

The County cannot be held liable for the actions of its employees on a theory of respondeat superior. <u>Back v. Hastings on Hudson U.S.F.D.</u>, 365 F.3d 107, 128 (2d Cir. 2004). The record contains no evidence from which I could conclude that any of the actions of any of the defendants were taken pursuant to a County policy or custom of retaliating against employees who exercise their First Amendment rights. Thus, no <u>Monell</u> liability lies. <u>Monell v. Dept. of Social Services</u>, 436 U.S. 658, 690-91 (1978). For <u>Pembaur</u> liability to attach, <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480 (1986), plaintiff must bring a claim concerning an action by an official whose edicts or acts may fairly be said to represent official County policy.

The County correctly points out that the only defendant whose actions might be said to constitute official County policy is Butler. Plaintiff does not contest this conclusion. Therefore,

to the extent that no claim lies against Butler, no claim lies against the County. This means that the County has no liability to plaintiff due to Butler's preferment of Section 75 charges against him.

This leaves the salary increment claim. It is undisputed that Butler made the final decision to deny plaintiff her raise. Section 1983 liability under <u>Pembaur</u> only attaches "where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." <u>Id.</u> For municipal liability to attach to the decision of one policymaking official, it is not sufficient for this official to have "discretion in the exercise of particular functions." Rather, the deciding official must "be responsible for establishing final government policy respecting such activity" before the municipality is subject to liability. <u>Id.</u>, at 481-83.

Municipal liability under <u>Pembaur</u> may be imposed for a single decision tailored to a particular situation and not intended to control later decisions. <u>Id.</u> For example, liability was imposed when a City Council passed a resolution firing plaintiff without a pretermination hearing. <u>Owen v. City of Independence</u>, 445 U.S. 622 (1980). And in <u>Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247 (1981), a City Council's decision to cancel a license permitting concert because of dispute over performance content constituted "official policy" for <u>Pembaur</u> purposes.

It is not automatically the case that high-level officials in government agencies are responsible for determining the policies of those agencies. In <u>St. Louis v. Praprotnik</u>, 485 U.S. 112 (1988), the Supreme Court determined that high-level city officials lacked final authority to create a retaliatory personnel policy where that authority was vested under local law in the mayor, alderman, or Civil Service Commission. <u>See</u> <u>Davis v. New York</u>, 57 Fair Empl. Prac. Cas. (BNA) 1553 (S.D.N.Y. 1990).  In <u>Rucci v. Thoubboron</u>, 68 F. Supp. 2d 311 (S.D.N.Y.

1999), the plaintiff corrections officer sought to hold the County liable for her alleged

discriminatory firing by arguing that the Sheriff had final policymaking authority with regard to

promotion and disciplinary decisions. The court found a material issue of fact regarding whether

the Sheriff had discretion to make these choices or whether he, in fact, established County policy

on these matters:

> ....the County Sheriff may have discretion to hire and fire
> employees without also being the county official responsible for
> establishing county employment policy. If this were the case, the
> Sheriff's decisions respecting employment would not give rise to
> municipal liability, although similar decisions with respect to law
> enforcement practices, over which the Sheriff is the official
> policymaker, would give rise to municipal liability. Instead, if
> county employment policy was set by the Board of County
> Commissioners, only that body's decisions would provide a basis
> for county liability. This would be true even if the Board left the
> Sheriff discretion to hire and fire employees and the Sheriff
> exercised that discretion in an unconstitutional manner; the
> decision to act unlawfully would not be a decision of the Board.
> However, if the Board delegated its power to establish final
> employment policy to the Sheriff, the Sheriff's decisions would
> represent county policy and could give rise to municipal liability.

Rucci v. Thoubboron, 68 F. Supp. 2d 311 (S.D.N.Y. 1999) (quoting Pembaur, supra, 475 U.S. at

484).

It is undisputed that Butler, the Commissioner of the Department of Public Works, made

the final decision to deny Magilton's salary increment in April 2004 (See Plaintiff's Memo, at

11; Defendant's Reply Memo, at 6.) But the municipality is only liable if Butler establishes the

government's policy with regard to the granting and denial of salary increments. As the County

has moved for summary judgment, the County bears the burden of showing the absence of a

genuine issue of material fact, Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The evidence provided by the defendants does not definitively establish the nature of Butler's policymaking powers. In his affidavit, Butler states that, "as Commissioner, I am responsible for granting annual salary increments to eligible employees." (Butler Affidavit, at 1.) He further states that he denied Magilton's increment in April 2004, but granted the increment three months later. (Id., at 2.) In his October 2004 deposition, Goldsmith refers to an unwritten policy governing salary increments, but does not indicate who had the power to establish such policy. (Deposition Testimony of Richard Goldsmith at 144, Exhibit 11 to the Affidavit of Kim Berg in Opposition to Motion for Summary Judgment, dated February 9, 2005 ("Berg Aff.").) The short excerpt provided from the Westchester County Charter says nothing about who makes salary policies for a County Department. (Berg Aff., Exh. 7.)

There remains a material issue of fact whether Butler, as Commissioner, established final government policy regarding the awarding or denial of salary increments for Department of Public Works employees, or whether he was merely granted discretion to grant or deny increments. Thus, the County's motion for summary judgment on this matter must be denied.

## Plaintiff's "Hostile Work Environment" Claim Will Go to the Jury, with Appropriate Instructions

The *sine qua non* of a claim of First Amendment retaliation under Section 1983 is that the plaintiff must have suffered some "adverse employment action" as a result of his protected speech. "Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999).

Defendant reasons from this that plaintiff's "hostile work environment" claim against Tocco, Goldsmith, and Dickman does not constitute adverse employment action.

At the outset, I note that both sides agree that the filing of disciplinary charges, the failure to raise plaintiff's salary and the failure to give him his fair share of overtime work – if these things are proven to have occurred – qualify as adverse employment actions.

In this Circuit, the creation of a hostile work environment can qualify as adverse employment action for Section 1983 purposes. <u>Phillips v. Bowen</u>, 278 F.3d 103, 109 (2d Cir. 2002). However, the acts constituting the alleged hostile environment must be so severe and pervasive as to make the work environment unreasonably inferior and adverse when compared to a typical workplace. As the Court of Appeals said in <u>Phillips</u>, "Our precedent allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass." <u>Id.</u> The Court continued: "Incidents that are relatively minor and infrequent will not meet the standard, but otherwise minor incidents that occur often and over a longer period of time may be actionable if they attain the critical mass of unreasonable inferiority." <u>Id.</u>

Plaintiff identifies the following incidents as constituting the creation of a hostile work environment: verbal abuse and threats by Dickman, Tocco, and Lee; being called into four meetings where he was attacked with false allegations and accused of being a troublemaker due to his filing of complaints; being ignored by Tocco on a daily basis in 2003; having his complaints of retaliation and harassment ignored; being required to put in for leave time when other employees were not, and being denied a transfer out of the hostile environment. Plaintiff contends that all of this took place within a five month period, and that, coupled with the salary and Section 75 and overtime issues, they qualify as creating a hostile environment.

If considered singly, some of the actions plaintiff identifies as creating a hostile work environment would not qualify as adverse employment action. For example, it is already settled law in this Circuit that the receipt of a counseling memo or notice of discipline does not constitute an adverse employment action. Weeks v. New York State Div. of Parole, 273 F.3d 76, 86 (2d Cir. 2001).[5] Similarly, denial of a transfer – even to get away from a particular supervisor – has also been held not to constitute adverse employment action. Williams v. R.H. Donnelley Corp., 368 F.3d 123, 128 (2d Cir. 2004). And being "ignored" by Tocco certainly does not rise to the level of an adverse employment action. The federal employment laws are not a civility code, Oncale v. Sundowner Offshore Servs., 523 U.S. 75 (1998), and thus do not reach Tocco's rude behavior.

As for the attacks on him during meetings, Plaintiff has identified four instances – April 23, 2003, May 7, 2003, May 21, 2003, and July 11, 2003 – when he was verbally attacked by Dickman and/or Tocco.[6] Four verbal attacks over the span of four months (where the allegations concern behavior over a period of more than two years) are nowhere near the "nearly constant" standard for hostile work environment that is set out in Philips. Neither were they equivalent to

---

[5] Also, plaintiff did not identify three of the six counseling memos as retaliatory at his deposition, at which he was asked to identify all instances of alleged retaliation. Obviously, he knew about those memos, since he received them. Plaintiff cannot supplement his testimony in response to this motion for summary judgment. Raskin v. Wyatt Co., 125 F.3d 55, 63 (2d Cir. 1977) ("a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, *by omission or addition*, contradicts the affiant's previous deposition testimony.") (emphasis added). So plaintiff cannot now allege that these three memos were issued in retaliation for his protected speech. He is limited to the three he did identify at his deposition.

[6] As noted above, this occurred during the period when Tocco was supposedly ignoring plaintiff. These arguments are logically inconsistent.

the despicable racist remarks to which the plaintiffs were regularly exposed in <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>, 223 F.3d 62, 69 (2d Cir. 2000).

Making plaintiff put in for leave time does not significantly alter the terms and conditions of plaintiff's employment – especially where, as here, plaintiff does not allege that he was denied leave when he requested it. And it is circular for plaintiff to claim that defendants ignored his complaints of retaliation when defendants deny retaliating against plaintiff. If plaintiff was retaliated against, defendants will be liable to him for the retaliation – not on a theory of hostile work environment.

The question is whether adding together all these discrete slights – none of which, individually, would entitle plaintiff to relief – creates an environment so hostile as to constitute an adverse employment action. From my perspective, plaintiff's laundry list is reminiscent of the laundry list of complaints that was held not to rise to that level in <u>Deters v. Lafuente</u>, 368 F.3d 185 (2d Cir. 2004), and so I am inclined to grant defendants' motion. But it is impossible to draw a bright line between a collection of complaints that qualifies as adverse employment action and one that does not. And even if I were to dismiss the claim, evidence about the incidents cited by plaintiff would come in, since it is probative on the question of the various individual defendants' intent. So on the whole, the better part of valor is to submit the matter to the jury, with appropriate instructions.

**All Defendants' Motion for Summary Judgment on The "Equal Protection" Claim is Granted**

Plaintiff argues that he was denied equal protection of the laws because the Section 75 charges were filed against him and because he was denied his salary increment. <u>City of Cleburne</u>

v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). Defendants are entitled to summary judgment dismissing that claim.

Plaintiff's claim can only stand if he provides the Court with evidence demonstrating that individuals who were similarly situated to him in every material way were purposefully treated differently than he was. Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005). Additionally, plaintiff has no claim for denial of equal protection against Commissioner Butler, who filed the Section 75 charges, or the County, because Butler cannot be sued for his decision to prefer those charges, on any theory. See Spear, supra, 954 F.2d at 66. Since no one else filed those charges, plaintiff's equal protection claim fails.

Insofar as the salary increment claim against Lee, Goldsmith, and Butler is concerned, plaintiff has failed to identify persons who are similarly situated to him. Had plaintiff pointed to a single person who got a raise after telling his supervisor to shove something up his ass and walking out of a meeting, after telling his supervisor to shove something up his ass (conduct to which plaintiff admits), then he might have a point. He has not done so.

**All Defendants' Motion for Summary Judgment on the Ground of Qualified Immunity is Denied**

The individual Defendants move in the alternative for summary judgment on the ground of qualified immunity. That motion is denied.

Government officials performing discretionary functions are entitled to qualified immunity "from federal constitutional claims . . . as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court indicated that the availability of qualified immunity ought to be decided by the Court at the earliest possible opportunity – preferably at the outset of the case, which is a point at which plaintiff's well pleaded allegations are assumed to be true, and defendant's version of the facts is immaterial. Thus, as the Second Circuit explained in Stephenson v. John Doe, Detective, 332 F.3d 68 (2d Cir. 2003), when determining a motion to dismiss on qualified immunity grounds in advance of full merits discovery, the plaintiff's version of the facts is presumed to be true, and the question to be answered is whether a reasonable government officer, confronted with the facts as alleged by plaintiff, could reasonably have believed that his actions did not violate some settled constitutional right.

The inquiry is a two-step one. First, the court must determined whether, taking the facts in the light most favorable to the party asserting the injury, a constitutional infraction was committed. Saucier, supra, 533 U.S. at 201. If the answer to that question is yes, the court must decide whether a reasonable official in defendant's position (as that position is described by plaintiff) ought to have known that he was violating plaintiff's constitutional rights by doing what plaintiff alleges he did. Ordinarily, the relevant inquiry will be whether the law is in fact well-settled – because if it is, "the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982). Claims that a public officer made a reasonable mistake of fact, "go to the question of whether the plaintiff's constitutional rights were violated, not the question of whether the officer was entitled to qualified immunity." Stephenson, supra, 332 F.3d at 78

(citing Saucier, supra, 533 U.S. at 205, 206). The fact that defendants did not move at the outset of the case, but waited until discovery was over, does not change the analysis.

It is no defense to a claim of qualified immunity that the defendant did not do what plaintiff said he did. On such a motion, I must presume that the plaintiff's version of events is true – even, in a case like this one, where discovery is complete. So in deciding a qualified immunity motion, a court cannot take into account assertions by the accused officer that contradict the plaintiff's allegations. Nothing in Saucier can be read to deprive the plaintiff of his Seventh Amendment right to have a jury resolve all disputed issues of material fact. If plaintiff's version of the facts is wrong and defendant's is correct, then the defendant will prevail, not on the ground of qualified immunity, but because he did nothing wrong.

A public employee's right not to be retaliated against for speaking out on matters of public concern is well-settled and has been well-settled for decades. No reasonable public official could possibly have thought that he was permitted to retaliate against a public employee for exercising his First Amendment rights. So if that is what defendants did, they are not entitled to qualified immunity. If that is not what they did, then they will prevail before the jury because they did nothing wrong. Defendants' motion is denied.

**What is Left**

I conclude that there are genuine issues of material fact that preclude the granting of summary judgment against plaintiff on the following claims:

1. Against Lee, Goldsmith, Butler and Westchester County on the salary increment claim.

3. Against Tocco, Dickman, Goldsmith, and Lee on the hostile work environment claim.

The parties should review the Pre-Trial Order and see if it requires any amending in view of this decision. Chambers will notify counsel of the date for the final pre-trial conference.[8]

This constitutes the decision and order of the Court.

Dated: July 25, 2005

_____
U.S.D.J.

BY FAX TO:

Kim Berg. Esq.
James P. Clark, Esq.

---

Raskin.

[8] I already have criminal trials scheduled through the end of September, so it may be a while.